IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:04CV264-MCK

| | |
|---|---|
| DONNA L. MILLS,<br>      Plaintiff, | )<br>)<br>) |
| vs. | )   **MEMORANDUM AND RECOMMENDATION** |
| | ) |
| JO ANNE B. BARNHART,<br>Commissioner of Social<br>Security Administration,<br>      Defendant. | )<br>)<br>)<br>)<br>) |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #6) and "Memorandum in Support ... " (document #7), both filed September 15, 2004; and the Defendant's "Motion For Summary Judgment" (document #8) and "Memorandum in Support of the Commissioner's Decision" (document # 9), both filed November 10, 2004. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

On January 24, 2001, Plaintiff applied for a period of disability and Social Security disability insurance benefits ("DIB"), alleging she became disabled on April 22, 1999, due to "reflux sympathic [sic] distrophy syndrome." (Tr. 96.) The Plaintiff's claim was denied initially and on

1

reconsideration.

The Plaintiff requested a hearing, which was held September 18, 2003. On September 25, 2003, the ALJ issued an opinion denying the Plaintiff's claim, that is, the ALJ concluded that the Plaintiff was not disabled at any time on or before September 30, 1999, her date last insured.[1]

Subsequently, the Plaintiff timely filed a Request for Review of Hearing Decision, which the Appeals Council denied on April 19, 2004, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on May 28, 2004, and the parties' cross-motions for summary judgment are now ripe for disposition.

## II. **FACTUAL BACKGROUND**

The Plaintiff testified that she was born January 30, 1969, and was 34 years-old at the time of the hearing; that she was 5' 3" tall and weighed 222 pounds; that she was married; that she had graduated high school and had completed a Certified Nursing Assistant ("CNA") course; that she had last worked on April 22, 1999, as a kitchen helper; that she had stopped working as a result of an on-the-job injury, that is, a fall in which she injured her left arm and shoulder; and that she had other work experience as a housekeeper, a CNA, and an assembler.

Regarding her medical and emotional condition, Plaintiff testified that as a result of her fall at work, she had stabbing pain in her left arm, could not lift her left arm due to shoulder pain, and had reduced range of motion in her neck; that she also suffered pain in her right arm and shoulder,

---

[1] A claimant is "insured for disability" and entitlement to DIB in a quarter in which she was fully insured and had "at least 20 [quarters of coverage] in the 40-quarter period . . . ending with that quarter." See 20 C.F.R. §§ 404.130(b), 404.131(b), and 404.315(a)(1). Based on her earnings record, Plaintiff had to show that she was disabled on or before September 30, 1999, when she last met the DIB insured status requirement. (Tr. 48).

back, and hips; that she suffered fatigue, weakness, and headaches; that she suffered asthma; that she had difficulty concentrating and remembering; that she could not sit or stand for long periods; that she had attended physical therapy; and that in 2002, she underwent carpal tunnel surgery on both wrists.

Regarding her daily activities, the Plaintiff testified that she required assistance to bathe and dress herself; that she could not perform any household chores; and that she did not drive.

A Vocational Expert ("VE") classified the Plaintiff's prior work as medium and unskilled (kitchen helper), medium and semi-skilled (housekeeper and CNA), and light and unskilled (assembly work and childcare).

The ALJ then presented the VE with the following hypothetical:

> [Plaintiff's] exertional impairments would permit at least sedentary and light work on a sustained basis. With significant unexertional limitations principally relating to her left arm and hand ... rule out jobs requiring full bilateral dexterity ... frequent or repetitive lifting or reaching above head or shoulder level with the left nondominant upper extremity ... rule out ... exposure to significant amounts of dust, fumes, chemicals, or similar pollutants ... assume a degree of chronic pain even with appropriate medication ... severe enough to rule out sustained skilled concentration ... if I were to place those ... limitations on ... a female of 30 years of age, with a high school plus educational level ... and [Plaintiff's] prior work to the extent it might be relevant, are there any jobs such a person could perform?

(Tr. 50-51.)

The VE testified that with these limitations, the Plaintiff could work as a companion, narrow fabric examiner, and bending machine attendant, all light, unskilled jobs with a total of 5,035 available in North Carolina; and as a nut sorter and dowel inspector, both sedentary, unskilled jobs with a total of 2,400 available in North Carolina.

The record also contains a number of representations by Plaintiff as contained in her various applications in support of her claims. On a Disability Report, dated February 1, 2001, Plaintiff stated

3

that her disabling condition was caused primarily by "reflux sympathic [sic] distrophy syndrome" (Tr. 96); and that in high school, she had attended regular, rather than special education, classes and had graduated. The Agency interviewer who took the report noted that the Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, forming coherent thoughts, sitting, standing, walking, seeing, or writing or otherwise using her hands.

On a Reconsideration Disability Report, dated April 23, 2001, Plaintiff stated that her condition was unchanged; that she could not lift "at all" with her left arm; that her doctor had restricted her from lifting more than 25 pounds and limited her bending, crawling, twisting, and reaching; and that she did not perform any household chores.

A Report of Contact, dated June 7, 2001, records that Plaintiff told the Agency interviewer that she cooked, cleaned the house, and did laundry; that she was alone most of the time because her husband worked "all the time"; that although she was forgetful, a "brain check" had been normal; and that she denied being "crazy or anything." (Tr. 117.)

On an undated Claimant's Statement When Request for Hearing Is Filed, the Plaintiff stated that her condition was unchanged and that she did not perform any household chores.

On March 8, 2001, Perry A. Caviness, M.D., completed a Physical Residual Functional Capacity Assessment and concluded that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; that she could sit, stand or walk six hours in an eight-hour work day; that she had limited ability to push and/or pull in her arms; that Plaintiff should avoid more than occasional climbing and balancing and more than frequent kneeling, crouching, and crawling; that Plaintiff had limited gross and fine manipulation and feeling in her left hand; that Plaintiff should avoid even moderate exposure to fumes or concentrated exposure to hazards; and that with those restrictions,

Plaintiff had the residual functional capacity for medium work.

On October 10, 2001, William Oliver Mann, D.O. completed a Psychiatric Review Technique and concluded that Plaintiff suffered a memory impairment and borderline intellectual functioning; that the Plaintiff suffered moderate, that is, nondisabling, restrictions of activities of daily living and difficulty in maintaining social functioning and concentration; but that there was no evidence of an extended episode of decompensation.

The same day, Dr. Mann completed a Mental Residual Functional Capacity Assessment and concluded that Plaintiff was capable of remembering and understanding short, simple instructions; that her pace and concentration were partially limited secondary to her intellectual functioning; that her social interaction was unlimited; and that she had moderate limitations on her ability to adapt to changes at work or to set realistic work goals.

Although there are relatively few medical records dated prior to Plaintiff's date last insured, September 30, 1999, at her request, the ALJ considered not only those records but also voluminous records post-dating the expiration of her insured status. The parties have not assigned error to the ALJ's recitation of the medical records, although, as discussed below, the Plaintiff objects to the weight that he gave to the alleged opinions of her treating physicians. Moreover, the undersigned has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> There is no evidence that the claimant was specifically treated for depression or any other emotional impairment during the relevant period. Progress notes from the claimant's primary care physician dated April 1999, through October 1999 did not show that the claimant ever complained of emotional problems. Exhibit 9F. In fact, the claimant did not specifically complain of depression with crying spells and some suicidal ideation until November 1999, 3 months after her date last insured. Her doctor prescribed Paxil. Exhibit 17F/6. Significant exacerbation of her depressive symptoms did not occur until early 2001. Exhibit 19F. Moreover, while Lisa

5

Brewer, a consultative licensed psychological associate reported in August 2001, that the claimant was somewhat anxious, she did not diagnose the claimant as suffering from depression, anxiety, or any other emotional impairment. Exhibit 12F.

On August 25, 2001, the claimant was examined by Lisa Brewer, a consultative licensed psychological associate. On the WAIS-III test, the claimant obtained the following IQ scores: verbal and performance IQs of 73 and a full scale IQ of 70, which placed the claimant in the range of borderline intellectual functioning ... however, the claimant stated that she made straight "A's" in school, and she denied having had any academic difficulty. Exhibit 12F.

The medical evidence of record shows that in April 1999, the claimant tripped and fell and injured her nondominant left upper extremity. Thereafter, the claimant complained of left elbow and shoulder pain. In April 1999, examination showed point tenderness along the left elbow and upper forearm and pain with pronation of the arm. She also demonstrated color change and coolness in the left arm and hand. In June 1999, x-rays showed a Grade II AC separation of the left shoulder. In September 1999, Dr. Mackel, an orthopedist, reported that the claimant would almost not allow him to touch her left arm due to hypersensitivity. The claimant complained of pain the left rotator cuff area with any attempted active motion of the shoulder. Active range of motion of the left shoulder was limited. The doctor concluded that the claimant was unable to perform her job as a food serve at that time, and that she would not be able to do so for quite some time. Exhibits 1F. 9F and 16F.

Subsequent examinations performed during the period in question or soon thereafter showed limited range of motion with extension in the left upper extremity and allodynia in the entire left upper extremity. The claimant was treated conservatively with medication, physical therapy and nerve blocks. She was diagnosed as suffering from reflex sympathetic dystrophy of the left upper extremity and a left shoulder AC joint separation. Exhibits 7F, 9F and 16F.

The record also shows that the claimant has a long history of asthma for which she was treated with steroid medication and inhalers. The claimant reported that dust, smoke, pollen, dampness, strong odors, weather changes and pets exacerbated her asthma symptoms. Exhibit 4F.

While examinations showed pain, limited range of motion, and global hypoesthesia of the left upper extremity and blanching of the left hand, the claimant had normal range of motion in her hands. Additionally, the claimant's dominant right upper extremity was completely normal. CPT neurosensory testing was abnormal in the left upper extremity, but the right upper extremity was normal. In fact, the claimant did not complain of progressively worsening pain and functional limitations in her hands and wrists until April 2002, when she was diagnosed with bilateral carpal tunnel syndrome and underwent carpal tunnel releases in April and May 2002.

However, these problems did not occur until more than two years after the period in question. In July 1999, the claimant complained of pain and swelling in her left elbow and triceps muscle region. She stated that this recurred after she was at the casino in Cherokee. However, an examination revealed no swelling or tenderness and full range of motion. Her neurovascular status was also intact. In October 1999, Dr. Thompson reported that the claimant had positive Waddell signs for radicular or peripheral nerve distribution. This suggests that the claimant exhibited symptom magnification and malingering. The claimant reported that she was sleeping well, which is also inconsistent with her testimony that she suffered from severe and constant pain. While she complained of increased left upper extremity symptoms and pain in early 2000, Dr. Thompson again noted positive Waddell signs for symptom magnification. Exhibits 7F, 9F, 16F, 17F and 22F.

Moreover, pulmonary function studies revealed only a "mild" restrictive disease. Although the claimant had a couple of pulmonary function tests which showed a moderate to severe restriction, these were performed in June 2000 and August 2000, nearly one year after the claimant's date last insured. In any event, in October 2000, her pulmonary function studies again showed only a mild restriction. Progress notes during the relevant period show that the claimant had only two exacerbations of asthma, in June 1999 and November 1999. Otherwise, she noted that her asthma was very stable with her medical regimen, and her doctor indicated that her asthma was only "mild." The next asthma exacerbation did not occur until March 2000, nearly 6 months after her date last insured. There is no evidence that the claimant was hospitalized for an asthma exacerbation until February 2001, over one year after her date last insured. Moreover, Dr. Brown, the claimant' treating pulmonologist, only restricted the claimant from working in environments where there was smoke, dust, or fumes. Exhibits 4F and 10F.

There is no evidence that the claimant complained of neck symptoms or pain until April 2000. An MRI showed mild cervical disc disease with stenosis. However, this was not until May 2000. Objective tests did not show herniated discs as noted by the claimant. In September 2000, she was involved in a motor vehicle accident and was diagnosed as suffering from an acute cervical sprain and cephalgia. X-rays at that time were essentially normal. The claimant did not complaint of low back pain until January 2000, when she was diagnosed with myofascial low back pain. She achieved significant relief in a few minutes with an injection of Toradol. The claimant did not complain of further back or leg problems again until February 2002, when she underwent a lumbar diskectomy and laminectomy. Exhibits 6F, 7F, 9F, 18F - 21F, 23F - 28F.

The claimant was also treated for knee pain due to patellar chondromalcia in December 2000. However, she indicted that he pain commenced only 6 months earlier, or June 2000. Thus, her knee symptoms and pain did not occur until 9 months after the period in question, Exhibit 18F.

In fact, examination of the cervical and lumbar spines in October 1999, revealed appropriate range of motion, without pain or tenderness. Examination of the lower extremities was normal with good range of motion and no pain. Although she was noted to have "patchy" hypoesthesia of the lower extremities, the doctor suggested symptom magnification or malingering on the claimant's part. The claimant was able to move about without difficulties. Exhibit 17F/3.

While the claimant's treating physician suggested that the claimant should not return to her past work as a food server/kitchen helper, which was "medium" in exertion, no doctor concluded that the claimant was disabled from performing all levels of work. In fact, in October 1999, Dr. Thompson, a treating pain specialist, noted that he advised the claimant not to return to work at present. However, he let her know that he expected that she would be ready to return to work in the very near future. Dr. Thompson stated that the claimant's prognosis for significant improvement was fair to good. He concluded that the claimant should be able to return to some sort of gainful employment in the near future, and he expected maximum medical improvement in 8 to 12 weeks. Exhibit 17F/4. He also stated that it was imperative that the claimant return to work as soon as possible. In fact, in May 2000, Dr. Thompson indicated that a cashier position would certainly be within the claimant's limitations. Exhibit 17F/10.

(Tr. 16-21.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes at any time prior to her date last insured, September 30, 1999. It is from this determination that Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d

343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether the Plaintiff became "disabled" as that term of art is defined for Social Security purposes before the expiration of her insured status on

9

September 30, 1999.[2] It is not enough for a claimant to show that she suffered from severe medical conditions or impairments which later became disabling; rather, the subject medical conditions must have become disabling prior to the date last insured. Harrah v. Richardson, 446 F.2d 1, 2 (4th Cir. 1971) (no "manifest error in the record of the prior administrative proceedings" where Plaintiff's conditions did not become disabling until after the expiration of his insured status).

The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to this proceeding; that the Plaintiff suffered reflex sympathetic dystrophy of the upper left extremity, left shoulder AC joint separation, asthma, and borderline intellectual functioning, which were severe impairments within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that the Plaintiff's borderline intelligence caused no more than mild restrictions to her daily activities and social functioning, a moderate restriction in concentration, persistence, or pace, and no episodes of decompensation; that Plaintiff had the residual functional capacity to perform unskilled, light work which did not involve using her left upper extremity for repetitive activity, overhead reaching or lifting, more than occasional climbing or balancing, full bilateral manual dexterity, hazards, or exposure to dust, fumes, chemicals, or other pulmonary

---

[2] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

irritants; that the Plaintiff was unable to perform her past relevant work; and that the Plaintiff was a "younger" individual with a high school education and no transferable skills from past relevant work.

The ALJ then correctly shifted the burden to the Defendant to show the existence of other jobs in the national economy which the Plaintiff could have performed. The ALJ concluded that the VE's testimony, which was based on a hypothetical that factored in the above limitations, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform and that, therefore, she was not disabled at any time prior to September 30, 1999.

The Plaintiff essentially appeals the ALJ's determination of her residual functional capacity ("RFC"). See Plaintiff's "Motion for Summary Judgment" (document # 6) and "Memorandum in Support ... " (document #7). The undersigned finds that Plaintiff's assertion of error is without merit, however, and that substantial evidence supports the ALJ's conclusions regarding the Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Agency medical evaluators concluded that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; that she could sit, stand or walk six

hours in an eight-hour work day; that she had limited ability to push and/or pull in her arms; that Plaintiff had nonexertional limitations related to climbing, balancing, kneeling, crouching, and crawling; that Plaintiff had limited gross and fine manipulation and feeling in her left hand; that Plaintiff should avoid even moderate exposure to fumes or concentrated exposure to hazards; and that with those restrictions, Plaintiff had the residual functional capacity for medium work. Agency psychological evaluators found that the Plaintiff's borderline intellectual functioning placed only moderate limits on her ability to concentrate and, at most, mild restrictions on her activities of daily living.

However, the ALJ found the Plaintiff not disabled based on her ability to perform unskilled light and sedentary work which did not involve using her left upper extremity for repetitive activity, overhead reaching or lifting, more than occasional climbing or balancing, full bilateral manual dexterity, hazards, or exposure to dust, fumes, chemicals, or other pulmonary irritants

At the outset, the undersigned notes that no physician has ever opined that the Plaintiff was disabled from working, nor does the medical record show that a doctor ever placed permanent restrictions on the Plaintiff's activities. To the contrary, no doctor who examined the Plaintiff ever concluded that her condition was as severe as she claimed, and two of her treating physicians, Dr. Thompson and Dr. Brown, opined that the Plaintiff could work. Indeed, in May 2000, Dr. Thompson indicated that a cashier position would certainly be within the Plaintiff's limitations.

The Plaintiff contends generally that the ALJ did not fully explain his rationale for the weight he gave to unspecified medical opinions concerning her various alleged impairments. The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and

severity of the alleged impairment is entitled to controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

However, an ALJ must weigh a treating source's medical opinion using the 20 C.F.R. § 404.1527(d) factors and explain the weight given, only when he determines that an opinion is not entitled to controlling weight. See SSR 96-2. Here, with regard to treating sources who opined that Plaintiff suffered from borderline intelligence, shoulder pain, reflex sympathetic dystrophy, hand pain and numbness, or asthma, the ALJ gave those opinions controlling weight, that is, he specifically found that Plaintiff suffered from severe impairments consisting of reflex sympathetic dystrophy of the left upper extremity, left shoulder AC separation, borderline intelligence, and asthma, and allowed the Plaintiff a nonexertional limitation related to limited dexterity in her left hand.

With regard to treating sources who opined that Plaintiff suffered from neck pain, muscle spasms, knee pain, disk herniation, obesity, sleep apnea, depression, or thoughts of suicide, the ALJ found that no weight would be given to those opinions and that those conditions did not amount to severe impairments at any time prior to Plaintiff's date last insured. See Tr. 19-21. The ALJ explained that the medical records relevant to those alleged impairments originated after the expiration of Plaintiff's insured status on September 30, 1999, and that she did not complain of those

impairments until after that date. For example, Plaintiff did not complain of, nor was she diagnosed with, obstructive sleep apnea until two years after her insured status expired. The ALJ noted that Plaintiff was not diagnosed with any emotional impairments during an August 25, 2001 psychological exam. Finally, prior to Plaintiff's date last insured, she was found only to be "overweight" (Tr. 246) and "slightly overweight" (Tr. 247), and almost one year after her date last insured, she was found to have only a "fair amount of central obesity." (Tr. 228.)

Rather than proving the existence of a disability, the medical record clearly supports the ALJ's essential conclusion: that prior to September 30, 1999, the Plaintiff suffered from, but was not disabled by, reflex sympathetic dystrophy of the upper left extremity, left shoulder AC joint separation, asthma, and borderline intellectual functioning. As noted above, Dr. Thompson, who saw the Plaintiff in October 1999 shortly after her insured status expired, opined that she could perform, at least, some light work and that it was "imperative" that she return to work. Moreover, the Plaintiff's shoulder and arm injuries were treated conservatively with medication, physical therapy, and nerve blocks, which were effective to control at least some of her symptoms, and she was never a candidate for surgery. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965). Moreover, at that time, the Plaintiff reported to her doctor that she was "running her own housecleaning service."

The record also establishes that the Plaintiff engaged in significant daily life activities during

the subject period, such as cooking, cleaning the house, and doing laundry; that she was able to care for herself for extended periods while her husband was at work; and that Plaintiff was also able to perform basic cognitive and physical tasks. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work" which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to

15

alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's reflex sympathetic dystrophy of the upper left extremity, left shoulder AC joint separation, asthma, and borderline intellectual functioning – which could be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter, 993 F.2d at 31 (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities, that is, Plaintiff's ability to take care of her personal needs, do household chores, and obtain certification as a nursing assistant, as well as the objective medical record, discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion For Summary Judgment" (document #6) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #8) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, Snyder, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable H. Brent McKnight.

**SO RECOMMENDED AND ORDERED,** this 16th day of November, 2004.

_____
**CARL HORN, III**
**U.S. Magistrate Judge**

bsw

United States District Court
for the
Western District of North Carolina
November 16, 2004

* * MAILING CERTIFICATE OF CLERK * *

Re:  3:04-cv-00264

True and correct copies of the attached were mailed by the clerk to the following:

    George C. Piemonte, Esq.
    Bollinger & Piemonte, PC
    601 East Fifth St.
    Suite 250
    Charlotte, NC  28202

    James M. Sullivan, Esq.
    U.S. Attorney's Office
    227 W. Trade St.
    1700 Carillon Bldg.
    Charlotte, NC  28202

```
cc:
Judge                       (X)
Magistrate Judge            ( )
U.S. Marshal                ( )
Probation                   ( )
U.S. Attorney               ( )
Atty. for Deft.             ( )
Defendant                   ( )
Warden                      ( )
Bureau of Prisons           ( )
Court Reporter              ( )
Courtroom Deputy            ( )
Orig-Security               ( )
Bankruptcy Clerk's Ofc.     ( )
Other_____        ( )
```

Date: 11-16-04

Frank G. Johns, Clerk
By: _____
Deputy Clerk